NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

19-60

STATE OF LOUISIANA

VERSUS

DAVID JAVON ARCENEAUX
AKA DAVID ARCENEAUX

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 17-240
HONORABLE CURTIS SIGUR, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of Elizabeth A. Pickett, D. Kent Savoie, and Candyce G. Perret, Judges.

AFFIRMED AND REMANDED WITH INSTRUCTIONS.

Alfred F. Boustany, II
Boustany Law Firm
P. O. Box 4626
Lafayette, LA 70502
(337) 261-0225
COUNSEL FOR DEFENDANT-APPELLANT:
    David Javon Arceneaux

**M. Bofill Duhe**
**District Attorney, Sixteenth Judicial District**
**W. Claire Howington**
**Assistant District Attorney**
**300 Iberia St., Suite 200**
**New Iberia, LA 70560**
**(337) 369-4420**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**Jeffrey M. Landry**
**Attorney General**
**Colin Clark**
**Chief of the Criminal Appellate Section**
**J. Taylor Gray**
**Assistant Attorney General**
**P. O. Box 94005**
**Baton Rouge, LA 70804**
**(225) 326-6200**
**COUNSEL FOR OTHER APPELLEE:**
      **State of Louisiana Department of Justice**

**PICKETT, Judge.**

## FACTS

On December 2, 2016, Javon Johnson, Truvone Dwellingham, and Travis Spears were sitting in a car in New Iberia while Mr. Johnson and the defendant, David Javon Arceneaux, discussed the purchase of marijuana. During the discussion, the defendant attempted to take money from the victim and then fired shots, hitting all three victims. The victims suffered non-life-threatening injuries.

On January 22, 2018, the defendant was charged by amended bill of information with three counts of attempted first degree murder against three separate victims, violations of La.R.S. 14:30(A)(3) and La.R.S. 14:27; one count of attempted armed robbery, a violation of La.R.S. 14:64 and La.R.S. 14:27; and one count of distribution of marijuana, a violation of La.R.S. 40:966(A)(1). After a three-day jury trial, the defendant was found guilty on April 18, 2018, of three counts of attempted manslaughter (responsive to three counts of attempted first degree murder), one count of attempted armed robbery, and one count of distribution of marijuana. On July 11, 2018, the trial court sentenced the defendant to ten years at hard labor on each count of attempted manslaughter, to ten years without benefit of parole, probation, or suspension of sentence for attempted armed robbery, and to ten years at hard labor for distribution of marijuana.[1] All sentences were ordered to be served concurrently. The defendant filed a Motion to Reconsider Sentence that was denied without a hearing on August 1, 2018.

On July 30, 2018, the defendant filed a Motion for Appeal that was granted on August 1, 2018.

---

[1]These are the sentences as they are set forth in the sentencing transcript. As discussed in the error patent section, there are discrepancies between the minutes of sentencing and the sentencing transcript.

## ASSIGNMENTS OF ERROR

Now before this court is an appeal filed by the defendant alleging three assignments of error:

1. The defendant believes that the Sixth Amendment to the United States Constitution, as incorporated by the 14th Amendment's Due Process Clause, and applied to the States, requires unanimous jury verdicts in serious criminal cases. This issue has been accepted for review by the United States Supreme Court in "*Ramos v. Louisiana,*" No. 18-5924 (United States Supreme Court). As appears from the face of this record, this defendant was convicted by a non -unanimous jury verdict. This was error.

2. The trial judge allowed the State of Louisiana to introduce evidence of another crime allegedly committed by this defendant, although the State failed to prove that crime by a preponderance of the evidence. Was this error?

3. Was it error for the jury to convict the defendant when the State of Louisiana did not prove the defendant's guilt beyond a reasonable doubt, as required by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993).

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there is one error patent and that the court minutes of sentencing require correction.

The court minutes reflect that the defendant's sentence for distribution of marijuana was imposed without the benefit of parole, but the sentencing transcript does not so indicate. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, the trial court is instructed to correct the court minutes of sentencing to delete the denial of the benefit of parole for the defendant's conviction of distribution of marijuana.

2

**ASSIGNMENT OF ERROR NUMBER THREE**

In his third assignment of error, the defendant alleges the evidence was insufficient for the jury to find beyond a reasonable doubt that he was the perpetrator of the offenses at issue. We will address this assignment of error first, as a finding that the evidence was insufficient would mandate acquittal. *State v. Hearold*, 603 So.2d 731, 734 (La.1992). Additionally, we note that in assignment of error number two, the defendant challenges the admission of other crimes evidence introduced at trial. When the issues on appeal relate to both sufficiency of the evidence and one or more potential trial errors, the reviewing court should first determine the sufficiency of the evidence. The rationale is that when the entirety of the evidence is insufficient to support the defendant's conviction, the defendant must be discharged as to that crime, and any other issues become moot. *Id.* Accordingly, we will address the sufficiency of the evidence first.

The defendant does not contest that the crimes occurred or that the elements of each offense were proved, he simply argues that the state failed to establish his identity beyond a reasonable doubt. According to the defendant, the state's case "rested solely on the incredible testimony of a convicted felon, drug dealer, and admitted liar." The standard of review in such a case is well-established:

> "In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984).

*State v. Hughes*, 05-992, pp. 5-6 (La. 11/29/06), 943 So.2d 1047, 1051 (alteration in original).

*Evidence at Trial*

The first witness at trial was Iberia Parish Sheriff's Deputy Phillip Early. He received a dispatch on December 2, 2016, regarding a shooting on Shot Street. While responding to the call, Deputy Early received another dispatch that a vehicle left the scene and was traveling west on Admiral Doyle Drive. Deputy Early eventually caught up to the car when it pulled into a gas station. The occupants of the car were the victims of the shooting – two white males and one black male. The victims had called dispatch and advised that they were scared and were not going to stop. Dispatch told the victims that deputies were behind them and eventually convinced the victims to stop. When Deputy Early first approached the car, he saw bullet holes throughout the car, windows, and side panels. Deputy Early testified that each of the victims was shot in the lower extremities of their bodies. On cross-examination, Deputy Early testified that none of the victims gave him a description of the shooter.

One of the victims, Jared Johnson, testified that he traveled to New Iberia on December 2, 2016, to purchase marijuana with two of his friends. At the time, Mr. Johnson lived in Pineville, Louisiana, and drove back and forth to Baton Rouge Community College, where he attended school. Mr. Johnson identified his two friends as Truvonne Dwellingham and Travis Spears. According to Mr. Johnson, a person named "K.J." set up the deal. It was dark when the victims arrived in New Iberia, and they picked up K.J. from a Walmart which Mr. Johnson agreed may have been in Broussard. The victims drove to the area where they were going to buy the marijuana, and K.J. got out of the vehicle. Mr. Johnson described the events that ensued as follows:

Q. Did y'all go into a house, did y'all stay in a yard, what?

A.    No. I didn't even exit the car. None of us exited the car. Whenever we pulled up - - Like I said, it was very dark. There were - - The street lights were there, but the street lights weren't even on. We pull up and K.J., I don't know if he got out immediately or if it was five minutes after, but K.J. does end up getting out of the vehicle, and that's when three other individuals were there - -

Q.    Uh-huh (An affirmative Response).

A.    - - and one of them ended up walking up to the car and - - I believe once K.J. got out, I think he sat in the back, cause one of them did sit in the back with a backpack, and I assumed that that was what we were going to get. And whenever he sat in, he showed part of what was in his backpack and it wasn't what they had told me I was coming to get, so Truvonne, the man in the back seat, my friend, he said that, "Hey" - - like he just made a remark to them and said, "Hey, that's not what you guys had said the deal was." And so he went back to his car and in turn came back shortly after and he showed - - well he didn't actually get in the car this time. And at this point my nerves were kind of uneasy. So he didn't actually get back in the car. I just rolled my window down about maybe half way, maybe slightly more, and he had stuck an ounce of marijuana through the window and asked, "Is this what - - you know - - Is this better" or - - I don't know what his words were, but he showed it to me and asked, "This is what you wanted?" And before I could even say yes or no or even observe anything he had already snatched back for that in my hand, and I had four hundred dollars in my passenger door that, I guess, he saw, because after he snatched what was in my hand, he immediately snatched the money also. At that point Travis put it in drive - - I don't even know if I did or Travis put it in drive, but my foot never left the brake. In a - - In all a matter of literal split seconds, it went from him handing me something through my window, to snatching back at it, to snatching the money, to being put in drive, me slamming the gas, and literal, just fireworks going off. And after that, I drove off - - I mean forward and I took the - - there was a stop sign, it was a fork, a left or a right, so I took a right and that ended up being a dead end.

Q.    Uh-huh (An Affirmative Response).

A.    So we went down the street to the dead end, and I turned my lights off halfway or down the dead end, cause the dead end was actually a loop somewhat, like a cul-de-sac, - - I'm sorry - - like a block, and whenever I turned back around, cause I turned back around halfway around the dead end street, I came back and kind of peaked around the corner and there was two sets of car headlights facing towards the direction I was coming from. So I turned around again and went back down the one-way that I was originally going down and I turned my headlights off and I actually turned around again and came back to where I saw the headlights and both sets of vehicles were going back to the way that I would have been coming down had I not turned back around to go back out with the headlights off; and

5

from there, I actually had my GPS routed at that time and we followed it and that's when we found the Chevron right there to the right after we came out.

Mr. Johnson said he did not see a gun but heard "fireworks" going off. Mr. Johnson explained where certain individuals were positioned when he heard the fireworks going off:

A.    Whenever I did pull off, the individual that handed me through the window was about parallel to me with the car, I believe K.J. was to the back left of the car, and then two other individuals actually stepped out in front of the car, one on the left, one on the right, and at that point that's when - - literal, it's just bang, bang, bang, fireworks, and I didn't even know - - actually, I wasn't able to fully process what had - - you know, had happened until after we drove off and I put my hand on my leg and I - - I realized I had been shot and - -

Mr. Johnson was shot in his upper right leg. According to Mr. Johnson, Travis was hit, but the bullet lodged in his wallet rather than penetrate his skin. Truvonne, Mr. Johnson testified, was shot in his left calf, and the bullet traveled to Truvonne's other calf.

On cross-examination, Mr. Johnson testified that he met K.J. in Baton Rouge about two weeks before the shooting. Mr. Johnson and K.J. were smoking weed together when K.J. told Mr. Johnson he could get better weed. The two exchanged numbers, and on the day of the shooting, Mr. Johnson called K.J. to buy an ounce and a half of marijuana. Mr. Johnson believed that he was going to buy an ounce and a half of weed from K.J. and then K.J. was going to take them somewhere else to buy "moon rocks." Mr. Johnson agreed that "moon rock" is "some pretty expensive weed." Thus, Mr. Johnson agreed that K.J. knew he would have money with him. The two agreed to meet at the Walmart in Broussard. Mr. Johnson understood that K.J. lived at a trailer park near Walmart but acknowledged that K.J. named two different places when asked where he was from. Mr. Johnson saw

6

K.J. walking in the Walmart parking lot but did not know if K.J. was walking from a home or walking from a car.

Mr. Johnson testified that he thought he would be buying the weed from K.J. in the Walmart parking lot. Instead, K.J. directed Mr. Johnson to drive to New Iberia. When they arrived, K.J. told Mr. Johnson to park in an area that Mr. Johnson described as dark. K.J. exited the car, walked up to three individuals, and discussed something that Mr. Johnson did not hear. When asked if "the guy" showed him the weed through the window, Mr. Johnson replied:

> A.     Right. Well at first he did sit in the back of the vehicle and he had a backpack and he showed - - he somewhat took the backpack off of his back, kind of opened it and showed me, and that's upon whenever I said that wasn't the quality of what I was told I was getting and so that's when he walked back and - - to the vehicle and couple of minutes later walked back to me and that's whenever he handed me the - - a bit through the window, my window.

Mr. Johnson could not see the guy's face since he was sitting behind him. Even when the guy subsequently approached the window, Mr. Johnson still did not see him. Mr. Johnson explained that it was dark, none of the street lights were on, and the guy had a dark hood over his head. Mr. Johnson described the guy as "a larger individual" when compared to K.J. and the other two individuals.

According to Mr. Johnson, K.J. was still outside of the car when the guy returned to his window, and K.J. never got back in the car. In fact, Mr. Johnson testified that he never heard from K.J. again. When defense counsel reminded Mr. Johnson that he told police that he thought K.J. had something to do with the incident, Mr. Johnson replied, "I thought that he had everything to do with it. I thought that he set the whole thing up." Mr. Johnson agreed that he did not know whether K.J. had a gun on him when he got into the car. Mr. Johnson testified that when K.J. got into the car at Walmart, he called someone to tell them they were on their way.

On re-direct examination, the following colloquy took place between Mr. Johnson and the state:

> Q:    When K.J. brought you there, there were three other guys there, correct?

**BY MR. JOHNSON:**

> A.    Yes, ma'am.

> Q.    And those three guys are the ones that robbed and shot at y'all, right?

> A.    Yes, ma'am, to my understanding.

Keonta James (K.J.) testified that he had a previous conviction for possession with the intent to distribute marijuana, that he was charged as a co-defendant in the present case, and that he admitted to his involvement in the drug deal at issue by entering a plea of guilty. K.J. testified that he was fearful of the defendant and concerned for his safety because of his testimony. K.J. described the incident in question as follows:

> Q.    Okay. And so y'all went - - Y'all met up at Walmart, you got in the car and - - and what happened after that?

> A.    We went to Shot Street. We was parked facing - - like facing the stop sign. Like the car was like - - We was on the left side the street, like where the houses at, the shotgun houses, the white houses, or whatever, and Dave came up to the car and - -

> Q.    And - - And when you say, "Dave," that's - - that's the defendant?

> A.    That's David Arceneaux, - -

> Q.    Okay.

> A.    - - came up to the car, he talked to them, asked them what they needed, or whatever, stuff like that. He showed them product, asked them if that's what they wanted and they didn't want that, so he left, went back get some other stuff, came back with some different - - with some different weed, or whatever, showed it to them. Whenever he was showing it to them, I - - I hop out - - I hop out the car, he had hop in to show them the weed, or whatever. And as he was showing them the weed, they had - - they had somebody else in the car, like

8

sitting back there like watching and stuff, whatever. And at the moment he had got out the car and he was showing him, like, "This is what you want? This - - You're sure this is what you want?" And they was tussling for - - whatever, it looked like they was tussling, and pull out the gun, he started shooting. And when he shot out, I - - I left, I shot out running, like I - - I took off running.

Q. You took off running. Where did you go?

A. I - - I was hiding - - hiding behind a house.

On cross-examination, K.J. stated that when he got out of the car, he stood by the trunk of the car on the driver's side.

According to K.J., there were two other individuals with the defendant, one of which was Shannon Phillips. When asked how he knew the defendant, K.J. testified, "I been knowing him since - - since I was like - - I want say about fifteen." The state then asked K.J. if he and the defendant were good friends, and K.J. replied, "Not anymore."

K.J. testified that he did not call the police after the incident because he was scared. About a week or two after the incident, K.J. was called in to the probation office and arrested by his probation officer. K.J. testified that the arrest pertained to the current incident. After his arrest, K.J. spoke with the police.

On cross-examination, K.J. testified that after the shooting, he called a person named Sage to come and get him. K.J. agreed that when he ran, he did not know if the victims had been shot. Even after seeing a news report that the police were looking for the suspects, K.J. did not call the police. K.J. agreed that he did not name the defendant until after he was "in handcuffs."

According to K.J., he drove from St. Martinville to the Walmart in Broussard to meet the victims. When asked if he left his car in the Walmart parking lot, K.J. responded, "I had - - I actually got dropped off." At first, K.J. denied telling Mr. Johnson that he walked to Walmart from a nearby trailer park

but then stated that he probably did tell him that. Finally, K.J. stated that he did not remember if he told Mr. Johnson that he walked from a nearby trailer. When asked if he was telling the truth when he told police that he no longer had his cell phone, K.J. replied:

A. I just cut it off. I ain't get rid of the phone. I had cut it off.

Q. And you cut the phone off because you didn't want Jared and them calling you, right? You didn't want to be in contact with Jared and the guys in that car?

A. No. I wasn't worrying about Jared; I was worrying about David Arceneaux.

When asked if any of his brothers had dreadlocks like him, K.J. responded, "Only one." As for meeting with the prosecutor in the case, K.J. said he did not think he met with her. Defense counsel and K.J. then had the following colloquy about the crimes for which he was charged in conjunction with the incident in question:

Q. Now when you got arrested on December 16th, 2016, you were charged with three counts of attempted murder?

A. Thought it - - it was two.

Q. Well two. And you also was charged with armed robbery, right?

A. No.

Q. You wasn't charged with armed robbery or - -

A. No.

Q. - - distribution of marijuana?

A. I was just charged with present to first - - present to first degree, attempted.

Q. Now, the detective that you met with, when you interviewed he told you you were in a lot of trouble, right?

A. Yes.

Q.     And he told you you was facing a lot of time in jail.

A.     Yes.

Q.     And, in fact, he told you that principal to first - - attempted first degree murder carries up to fifty years, right?

A.     Yes.

Q.     And you were scared of that, right?

A.     Yes.

Q.     Because you don't want to go to jail for fifty years.

A.     Yes.

Q.     Now, I'm just trying to clarify what I heard.  You said that you were convicted of a crime.  When you say you were convicted of possession of marijuana, is that in this case or is that another case?

A.     That was a case, I - - I think I caught in, like, 2016 - - '15.  I'm on probation for it.

Q.     Yeah.  So that case - - And that case is in St. Martinville, where you're convicted of - - actually you're convicted of distribution of marijuana.

A.     Yes, sir.

Q.     In St. Martinville.

A.     Yes, sir.

Q.     And you're on probation right now.

A.     Yes, [sic]

Q.     And, in fact, that's why you're in jail right now, because you have a probation revocation coming up.

A.     Yes.

Q.     And in that case you're facing thirty years.

A.     No, but - - not - - No.  Three years.

Q.     Three - - Who told you was facing three years?

A.     It's three years.

11

Q.     Okay.

A.     Was three years probation.

Q.     In that case when you pled guilty, in fact, you didn't plead guilty to a sentence, Right?

A.     (No Response).

Q.     You pled guilty to three years probation; and if you got in trouble, the judge would later determine what sentence you get; isn't that true?

A.     Yes.

Q.     Okay. So - -

A.     I think so, yes.

Q.     In that case you're actually - - On that probation revocation right now, you're facing up to thirty years in jail if the judge would revoke your probation, up to thirty years in jail.

A.     I think so. Not that I - - I don't - - I don't remember that.

Q.     And you don't want to do thirty years in jail on that neither, right?

A.     No.

K.J. agreed that if he had not made a deal with the state, he would have gone to jail for a long time. K.J. acknowledged that he wanted to be involved in the lives of his two young children – a five-year-old son and a newborn baby girl.

K.J. denied being a member of a rap group called Block Lyfe but admitted that he participated in a music video for the group. K.J. also admitted that the people in the video, which included himself at times, talked about killing people, robbing people, and selling drugs. Even though he denied being a member of Block Lyfe, K.J. acknowledged that he sometimes wore shirts with "BL" written on them. When asked if he wore the shirt because he was in the video and was hanging around the guys in the group, K.J. replied, "Yes." K.J. acknowledged that he goes by the nickname "Goonie." Finally, defense counsel introduced

12

photographs identified as Defense Exhibits 1 through 10. K..J. acknowledged that he was in all of the photographs. Some of the photographs contain multiple people. There are some photographs, however, containing one individual, which is presumably K.J. since he testified that he was in all of the photographs. The photographs show K.J. as having what appears to be dreadlocks, as holding lots of money, as holding what appears to be a pistol, and as holding what appears to be an assault rifle.

On re-direct, K.J. agreed that he admitted to his involvement in this case by pleading to the charges and acknowledged that he is still facing thirty years.

The next witness to testify, Brandon Blood, was a detective for the Iberia Parish Sheriff's Office on December 2, 2016, and participated in the investigation of the incident at issue. According to Detective Blood, K.J. told him the following after he was arrested:

> A. When I first got to him and started speaking to him, at first he didn't want to really say anything. He kept saying, you know, you know the guys, you know the people. He's like his - - He kept calling one of the guys Dave. He said, "You know Dave." It's like, "I don't know Dave." You know, I kept trying to explain to him I'm not from here so I really don't know anybody. And when we finally started talking to him, he kept telling me that he was scared. He kept telling me that if - - "If I tell you anything, then I'm gonna get shot." He said, "If I tell you anything, my family's gonna get shot. My family - - They know where my family lives."

Detective Blood testified that he did not promise K.J. anything in exchange for his testimony. According to Detective Blood, the defendant, Shannon Phillips, and Jashawn McCoy were arrested in connection with the incident in question. Detective Blood testified that the cases against Shannon Phillips and Jashawn McCoy are still pending.

On cross-examination, Detective Blood agreed that he knew of no physical evidence that connected the defendant to the incident in question. Detective

Blood also testified that if the recording of Mr. Johnson's statement said that Mr. Johnson told police that none of the guys had gold teeth, Detective Blood could not dispute the recording. During the state's rebuttal, Detective Blood testified that the question to Mr. Johnson regarding gold teeth was in reference to K.J. Detective Blood was trying to get a description of the person referred to as K.J. When asked if the defendant had gold teeth when he was arrested, Detective Blood testified that he could not say yes or no.

The next witness, Milton Alexander, testified regarding other crimes evidence. Defense counsel noted his continuing objection to the court's pre-trial ruling to the admissibility of Mr. Alexander's testimony. At defense counsel's request, the trial court gave the following instruction to the jury:[2]

> THE COURT: Okay. Ladies and Gentlemen of the Jury, you're about to hear testimony of evidence of other crimes involving this defendant, which is different from what he - - he's on trial for. So the purpose of this evidence is to show guilt, intent and systems, okay? All right.

Although this statement is arguably incorrect, no objection to it was made at trial, and the issue was not raised on appeal. Further, in closing instructions the trial court correctly gave a complete limiting instruction to the jury.

Mr. Alexander testified that he had previous convictions for both simple burglary and possession of marijuana. When the state directed Mr. Alexander to the time he was shot on January 4, 2014, Mr. Alexander testified, "All I remember, (unintelligible) was driving, got flagged down. That's all I remember. An

---

[2] In its closing instructions to the jury, the trial court stated:

Evidence that the defendant was involved in an offense other than the offense for which he is on trial is to be considered only for a limited purposes [sic]. The sole purpose for which such evidence may be considered is whether it tends to establish proof of the motive, opportunity, intent, preparation, a system or plan, knowledge, identity, absence of mistake or accident. Remember the accused is on trial only for the offense charged. You may not find him guilty of this offense merely because he may have committed another offense.

14

altercation went down. I drove myself to the hospital. That was it." Mr. Alexander testified that he was driving a car, and his passengers were Carroll Delahoussaye and Me'Khi Gregoire. Mr. Alexander denied that he was participating in a drug deal and denied knowing the person who flagged him down. When asked what happened after he pulled over, Mr. Alexander testified that he remembered driving himself to the hospital and then waking up in the hospital. When asked if he remembered telling the police that David Arceneaux shot him, Mr. Alexander testified that he never spoke to the police and never told police that David Arceneaux shot him. Mr. Alexander testified that he was shot in the stomach.

Carroll Delahoussaye testified that on January 4, 2014, he was in the car with Milton Alexander and another individual. According to Mr. Delahoussaye, someone flagged their car down, and the driver stopped. The driver was talking to "a dude," and someone pulled Mr. Delahoussaye out of the back seat and hit him with a pipe or pistol. According to Mr. Delahoussaye, Mr. Alexander was hollering, "Man, he shot me." Mr. Delahoussaye stated that Mr. Alexander did not say who shot him, that Mr. Delahoussaye did not see who shot Mr. Alexander, and that Mr. Delahoussaye did not tell the police who shot Mr. Alexander. When asked if he ever told an officer that David Arceneaux shot Mr. Alexander and that Mr. Delahoussaye was beaten up by Jacoby Harrison, Jabryson Kinchen, and Jawaski Sam, Mr. Delahoussaye replied, "No. No. No."

The state called Sean Moore, a detective with the Iberia Parish Sheriff's Department who investigated the shooting on January 4, 2014. Detective Moore spoke with both Mr. Alexander and Mr. Delahoussaye at the hospital. Detective Moore estimated that he spoke with both victims within an hour or so of the shooting. According to Detective Moore, Mr. Alexander told him he was shot by

David Arceneaux during a sale of marijuana. Mr. Delahoussaye, Detective Moore testified, described the incident as follows:

> A.     Carroll stated that they went - - he had went with Milton to sell the marijuana, along with a juvenile. And when they got there, that David and some other subjects ran up to the car and that David had opened the driver's door and pointed a gun at Milton. And then shortly after that, there was a struggle over the weapon between David and Milton and they were shot - - Milton was shot.
>
> Q.     Okay. And what happened to Carroll?
>
> A.     Carroll was - - attempted to get the gun from David, but was drugged out the car and kicked in the head and beaten.

Detective Moore attempted to speak with both Mr. Alexander and Mr. Delahoussaye after they were released from the hospital but was unsuccessful. On cross-examination, Detective Moore testified that the case had been dismissed by the Attorney General's Office.

Tyler Dauphinet was employed with the New Iberia Sheriff's Department on December 2, 2016, the date of the incident at issue in the present case. When Officer Dauphinet arrived at the scene, there were bullet casings all over the ground. Officer Dauphinet identified State's Exhibit 4 as a ten-dollar bill found in the middle of the shell casings. According to Officer Dauphinet, no guns were recovered from the crime scene.

The final witness to testify in the state's case-in-chief was Detective Stacie Smith, a Crime Scene Technician. Detective Smith identified photographs showing the condition of the car involved in the shooting on December 2, 2016. On cross-examination, Detective Smith acknowledged that he was able to retrieve fingerprints from the rear window on the driver's side. Those fingerprints, Detective Smith testified, did not link to David Arceneaux. On re-direct, Detective Smith testified that the fingerprints belonged to Jashawn McCoy.

16

In its case-in-chief, the defense called Riley Muffoleto, a deputy employed by the Iberia Parish Sheriff's Office on December 2, 2016. When Deputy Muffoleto reached the gas station where the car involved in the shooting was parked, he spoke with Mr. Dwellington, a passenger in the back seat who had been shot in his right foot. Mr. Dwellington described the suspect as an unknown black male with long dreads, wearing a dark colored hoodie, and wearing dark colored pants.

The defense played a recording of the 911 call made in this case. In his closing argument, defense counsel stated that the 911 caller described the suspects as some black guys and stated that "they" had dreads. A review of the 911 tape reflects that the caller described the suspects as black guys with dreads. Defense counsel also argued that the defendant did not have dreads at the time of trial and did not have dreads at the time of the incident. However, no evidence was presented as to whether or not the defendant had dreads at the time of trial or at the time of the incident.

The defendant argues the state failed to prove its case beyond a reasonable doubt since the state's case "rested solely on the incredible testimony of a convicted felon, drug dealer, and admitted liar." The defendant asserts that one "glaring void" that makes "K.J.'s testimony incredibly unbelievable" is the fact that K.J. never explained how he would make money selling marijuana when the defendant was the person making the sale. The defendant also notes the state's failure to call "Sage" to testify in order to support K.J.'s story. The defendant further asserts that the jury would not have convicted the defendant without the admission of the other crimes evidence. Other than K.J., the defendant argues, no other witness identified the defendant as a participant in the crime, and no physical evidence connected the defendant to the crime – no fingerprints, no gun, and no

17

telephone records. The defendant further argues that the descriptions given by the victims did not match the defendant.

The description given during the 911 call, the defendant argues, matched the description of K.J. as shown in the photographs admitted at trial.

Finally, the defendant argues K.J. lied in order to get a good deal from police, thus, K.J. had much to gain by testifying falsely. Because of the state's weak case, the defendant contends, the state introduced inadmissible other crimes evidence to prove the defendant had a "pattern of violence." The defendant argues his conviction should be reversed since the evidence failed, as a matter of law, to prove beyond a reasonable doubt that the defendant is guilty.

The state's response notes that the jury was well aware of K.J.'s criminal history, his pending probation revocation, and his status as a co-defendant in this matter. The state further notes that Mr. Johnson's testimony substantially corroborated K.J.'s recollection of the shooting. Considering the long-standing principle that the identification by a single witness, if credited by the jury, is sufficient to support a conviction, the state contends the jury's credibility determination should not be second-guessed. Thus, the state concludes, the evidence was sufficient to support the defendant's convictions.

*Analysis*

The defendant does not contest that the elements of the crimes for which he was convicted were proven in this case. Rather, the defendant contests the state's identification of him as the perpetrator. When the sole issue is the defendant's identity as the perpetrator, the supreme court has explained:

> [W]hen the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. *State v. Weary*, 03-3067 (La. 4/24/06), 931 So.2d 297; *State v. Neal,* 00-0674 (La. 6/29/01), 796 So.2d 649. Positive identification by only one

18

witness is sufficient to support a conviction. *Weary*, 03-3067 at p. 18, 931 So.2d at 311; *Neal*, 00-0674 at p. 11, 796 So.2d at 658; *State v. Mussall*, 523 So.2d 1305, 1311 (La.1988). It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. *State v. Bright*, 98-0398, p. 22 (La. 4/11/00), 776 So.2d 1134, 1147.

*Hughes*, 943 So.2d at 1051.

As this court has previously stated:

In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. The question of the credibility of the witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. The credibility of the witnesses will not be re-weighed on appeal.

*State v. Westmoreland*, 10-1408, p. 6 (La.App. 3 Cir. 5/4/11), 63 So.3d 373, 379, *writ denied*, 11-1660 (La. 1/20/12), 78 So.3d 140 (quoting *State v. Perry*, 08-1304, p. 2 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, 344, *writ denied,* 09-1955 (La. 6/25/10), 38 So.3d 352).

Through K.J.'s statement to Detective Blood and his description of the incident at trial, the defendant was identified as the person who attempted to sell drugs to the victims, as the person who attempted to rob the victims, and as the person who shot at Mr. Johnson and the other victims. The jury obviously chose to believe K.J. despite his criminal history and despite his status as a co-defendant in this case. The jury also saw the photographs of K.J. holding weapons, having dreadlocks, and appearing with a group of people that could be a gang. The jury heard Detective Blood's testimony that one of the victims described the suspect as having dreadlocks. Although defense counsel argued to the jury during closing argument that the defendant did not have dreadlocks at the time of the incident, no evidence of this was presented at trial. Thus, K.J.'s identification of the defendant did not conflict with physical evidence. As argued by the state, K.J.'s description

of the incident was corroborated by Mr. Johnson's testimony at trial. Specifically, we note that Mr. Johnson testified that K.J. was to the back left of the car when the shooting occurred. This matched K.J.'s testimony that he was standing by the trunk of the car on the driver's side. Furthermore, Mr. Johnson described the perpetrator as larger than K.J., distinguishing K.J. from the perpetrator. Finally, Mr. Johnson testified that he understood the perpetrators were the three guys that met them at the scene.

After considering all of the above, the jury weighed the credibility of witnesses and chose to believe K.J.'s testimony that the defendant was the perpetrator. This court should not re-weigh the credibility of the witnesses in this case. Accordingly, the defendant's contention that K.J. is an unreliable witness lacks merit as it does nothing more than seek to have this court re-assess witness credibility on appeal.

As argued by the state, the jury rejected the defendant's hypothesis of innocence that K.J. was the real perpetrator. This court has stated the following regarding a jury's rejection of a defendant's hypothesis of innocence:

> With respect to a jury's rejection of a hypothesis of innocence, our supreme court in [*State v.*] *Calloway*, [07-2306 (La. 1/21/09),] 1 So.3d [417] at 422 (citations omitted), concluded:
>
> > [W]e have repeatedly cautioned that due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law." Thus, as Judge Pettigrew emphasized, when a jury reasonably and rationally rejects the exculpatory hypothesis of innocence offered by a defendant's own testimony, an appellate court's task in reviewing the sufficiency of the evidence under the Due Process Clause is at an end unless an alternative

20

> hypothesis "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.' "
>
> The jury's decision to reject the defendant's hypothesis regarding the commission of the crime was based upon its rational credibility and evidentiary determinations. Accordingly, the jury's verdict should not be overturned.

*State v. Jackson*, 14-9, pp. 12-13 (La.App. 3 Cir. 6/18/14), 146 So.3d 631, 639, *writ denied*, 14-1544 (La. 2/27/15), 159 So.3d 1066.

Likewise, the jury's rejection of the defendant's hypothesis of innocence in the present case was based upon its rational credibility and evidentiary determinations.

Accordingly, we find this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER ONE

The defendant contends the Sixth Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment and applied to the States, requires unanimous jury verdicts in "serious criminal cases." The defendant notes that the jury's verdicts in the present case were non-unanimous. The state argues, however, that the defendant is precluded from raising a constitutional challenge on appeal since the challenge was not raised in the trial court. The defendant alleges the issue should be recognized as an error patent because "[i]t appears highly likely the United States Supreme Court will declare Louisiana's non-unanimous jury verdicts unconstitutional." We recognize that *Ramos v. Louisiana*, __ U.S. __, 139 S.Ct. 1318 (2019), a case pending before the United States Supreme Court, challenges the constitutionality of Louisiana's non-unanimous jury verdicts. The defendant is correct in that *if* the Supreme Court finds a non-unanimous jury verdict to be unconstitutional for the types of verdicts returned in the present case and *if* the Supreme Court applies such a holding

retroactively to include the jury verdicts returned in the present case, the verdicts returned in the present case would be improper and would be considered an error patent. The Supreme Court, however, has not yet made such a decision, and, as discussed below, the jury verdicts returned in the present case are valid verdicts under the law applicable to this case. We find no error patent occurred regarding the jury's verdicts in the present case.

The defendant was charged with three counts of attempted first degree murder, one count of attempted armed robbery, and one count of distribution of marijuana. The attempted first degree murder charges and attempted armed robbery charge are all necessarily punishable at hard labor. At the time of the defendant's offenses (December 2, 2016) and at the time of his convictions (April 18, 2018), La.Code Crim.P. art. 782(A) provided a defendant charged in a case "in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict." Thus, the jury's verdicts of guilty with ten out of twelve concurring on these charges were proper. Likewise, the jury's verdict of guilty with ten out of twelve concurring as to the result was also proper for the charge of distribution of marijuana, since that charge, which is punishable with or without hard labor, was properly joined in the same charging instrument as the attempted first degree murder and attempted armed robbery charges. La.Code Crim.P. art. 493.2.

These statutory requirements for a valid jury verdict are consistent with the provisions of La.Const. art. 1, § 17 in effect at the time of the defendant's offenses and convictions. In the November 6, 2018 election, Louisiana voters opted to change La.Const. art. 1, § 17 to require unanimous verdicts in some instances, and the legislature likewise amended La.Code Crim.P. art. 782(A) to coincide with the constitutional amendment. The amendment to La.Const. art. 1, §17 states:

22

Section 17. **(A) Jury Trial in Criminal Cases.** A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case for an offense committed prior to January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict.

La.Const. art. 1, § 17(B) was not changed and still allows non-unanimous jury verdicts in cases where offenses necessarily punishable at hard labor are joined with offenses punishable with or without hard labor. It is not clear whether the legislature purposefully left section B unchanged or inadvertently failed to amend it to align with the new requirements of amended section A. Nonetheless, resolution of this issue is not necessary since amended section A does not apply to the defendant. The pre-amendment versions of La.Const. art. 1, § 17 and La.Code Crim.P. art. 782(A) apply to this case since the defendant's offenses were committed prior to January 1, 2019.

The constitutionality of non-unanimous jury verdicts provided for in the pre-amendment version of La.Code Crim.P. art. 782(A) was upheld by the Louisiana Supreme Court in *State v. Bertrand*, 08-2215, 08-2311 (La. 3/17/09), 6 So.3d 738. Additionally, earlier this year, this court denied a defendant's writ application seeking to declare the pre-amendment version of La.Code Crim.P. art. 782(A) unconstitutional, stating:

> As recently as 2010, in footnote fourteen of *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 130 S.Ct. 3020 (2010), the Supreme Court stated that the Sixth Amendment right to trial by jury does not require a unanimous jury verdict in state criminal trials, citing *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628 (1972), and *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620 (1972), and noting the unusual division of the Justices and Justice Powell's tie-breaking concurrence in *Apodaca*. Given that the Supreme Court has so recently stated that the Sixth Amendment right to trial by jury does not require a unanimous jury verdict in state criminal trials, we decline to hold

23

otherwise. We adopt the reasoning utilized by our supreme court in *State v. Bertrand*, 08-2215, 08-2311 (La. 3/17/09), 6 So.3d 738, regarding the constitutionality of La.Code Crim.P. art. 782(A) under the Sixth Amendment.

*State v. Small*, 19-64 (La.App. 3 Cir. 1/25/19) (unpublished opinion).

Finally, this court recently rejected a defendant's claim that he should receive a new trial because he was convicted by a non-unanimous jury. *State v. Jinks*, 18-733 (La. App. 3 Cir. 5/1/19) (unpublished opinion). Accordingly, the non-unanimous verdicts returned in the present case were proper, no error patent occurred, and the defendant's assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

The defendant argues the trial judge erred in allowing the admission of other crimes evidence that was not proved by competent evidence. The other crimes evidence consisted of the testimonies of Milton Alexander, Carol Delahoussaye, and Detective Sean Moore as to an incident that occurred on January 4, 2014. We have reviewed the evidence as to that incident in the previous assignment of error. A hearing on the admissibility of such evidence was held on January 22, 2018. At the hearing, Mr. Delahoussaye testified similarly to his trial testimony, denying that he knew the identity of the perpetrator of the January 4, 2014 incident and denying that he named David Arceneaux as the perpetrator of that incident. Detective Sean Moore also testified at the pre-trial hearing. As he did in his trial testimony, Detective Moore testified that Mr. Alexander and Mr. Delahoussaye named David Arceneaux as the person who shot them. At the pre-trial hearing, Detective Moore identified the defendant as David Arceneaux. Detective Moore also testified that no forensic evidence linked the defendant to the January 4, 2014 incident.

24

At the pre-trial hearing, the state introduced the testimony of K.J. in order to establish the similarity of the January 4, 2014 incident to the December 2, 2016 incident at issue in this case. Finally, the state introduced an affidavit of Detective Blood, and the following arguments were then presented:

MS. BURKE: Your Honor - - Your Honor, the Court can rule that other crimes evidence is admissible to be introduced at trial when the State meets its burden of proof showing that the other crimes fall under the exception of intent, knowledge and absence of mistake. And as it is shown here, the State - - intent is actually gonna be an issue at trial. It is an element of the - - the crime that's charged. The crimes are similar enough. Both of them are shootings, they took place at basically the same area, it was a drug deal, there's multiple victims, there's vehicles, I mean they're basically the same thing, just in different - - different years. The - - And the current case the victims are from out of town. But other than that, it's very similar. There were victims shot in both cases. And in both cases the - - the defendant was the first initiator with - - with both of the victims. The State - - The State seeks to introduce this evidence at trial.

MR. DANIELS: Your Honor, as you're - - Your Honor is well aware for 404B to be introduced, the very threshold of question that has to be satisfied to the Court, that this defendant in fact committed the other crime. The testimony of Mr. Carroll Delahoussaye was clear; David Arceneaux didn't commit this crime.

THE COURT: No, he said he - - he had - - they had shirts over their face.

MR. DANIELS: Yeah, he said they had shirts over their face, but there was no - - in court identification that David Arceneaux was one of those men - - he had - - there was no testimony that David Arceneaux - - he believed that one of these men, masked men, was David Arceneaux. That's the very threshold question that they have to - - they have to - - They have to cross that threshold first. And I submit that they did not cross that threshold. The next issue: The State alleges that these crimes are so similar, yet there's - - there's no evidence, other than there was a robbery in the area of Shot Street on one of them and then there was another robbery on Shot Street. There's always robberies in that area, Judge. There's always robberies in Iberia Parish, or shootings. So to say that they're similar, they didn't - - they didn't meet their burden of showing that these two cases are identical or they - - it is to be some kind of signature crime - - that Mr. Arceneaux has a signature crime and uses a certain type of gun or uses a certain - - he does certain type of thing. There's been no evidence of that. This evidence, Your Honor, was - - do nothing more than confuse the issue for the jury, whether or not Mr. David Arceneaux is guilty of the crime that was committed on December 2nd,

25

2016, nothing more. They would have to call witnesses that would be unduly delayed - - It would prejudice Mr. Arceneaux to allow this evidence, cause the witness already said, "Some guys beat me up. I don't know who did it. They had masks on their face." I would submit, Your Honor, this evidence should not be admitted, cause it's simply not relevant, the State hasn't met their burden of proof; therefore, this evidence shouldn't be introduced and the State should be limited to the evidence that's before the Court from December 2nd, 2016. And we ask that the motion be denied.

The state asked the court to delay its ruling until Milton Alexander was available to testify, but the defendant objected. The trial court then issued the following ruling:

> THE COURT: The Court sat here listening to the witnesses on the prior incident and the witness here today and the Court is going to grant the State's 404B motion, finding intent, knowledge and absence of mistake.

The defendant noted its objection to the trial court's ruling. At trial, defense counsel stated its objection was still standing. Before evidence of the prior incident was introduced, as we have previously noted, the trial court gave a limiting instruction to the jury.

*Jurisprudence*

The supreme court has held that "[a] district court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion." *State v. Taylor*, 16-1124, 16-1183, p. 18 (La. 12/1/16), 217 So.3d 283, 296 (citing *State v. Galliano*, 02-2849 (La. 1/10/03), 839 So.2d 932). In *Taylor*, 217 So.3d at 291, the supreme court stated the following regarding the state's burden of proving the commission of the other crimes evidence:

> [We] now recognize and hold that when seeking to introduce evidence pursuant to La. C.E. art. 404(B), the state need only make a showing of *sufficient* evidence to support a finding that the defendant committed the other crime, wrong, or act.

The defendant's argument focuses on the lack of competent evidence that the defendant was the perpetrator of the other crimes evidence. The defendant also

26

takes issue with the state's attempt to use Detective Moore's testimony to impeach the credibility of both Mr. Alexander and Mr. Delahoussaye. Although the defendant acknowledges that impeachment is permissible, he argues it was not proper in the present case. No objection was made to Detective Moore's testimony either at the pre-trial hearing or at trial.

Finally, the defendant argues that the erroneous admission of the other crimes evidence was not harmless error. The defendant notes the lack of any witness other than K.J. that identified the defendant as the perpetrator of the current offense. Additionally, the defendant notes the lack of physical evidence linking defendant to the crime as well as the defendant's lack of dreadlocks even though the perpetrator was described as having dreadlocks.

The state responds to the defendant's argument by noting the supreme court's decision in *Taylor*, 217 So.3d 283, that a lower standard than clear and convincing evidence is required for the admissibility of other crimes evidence. As noted by the state, the standard is now "sufficient" evidence to support a finding that a defendant committed the prior offense. The state contends such a standard was met in this case.

The state argues that although at trial, neither victim identified the defendant as the perpetrator, they both confirmed that the incident occurred and that they were both injured as a result. The state further points out that Detective Moore testified that following the offense both men identified the defendant as the perpetrator. The state argues the previous offense happened in circumstances similar to the circumstances at issue in this case.

*Legal Analysis*

Although neither of the victims of the prior incident named the defendant as the perpetrator of the January 4, 2014 incident during their testimonies, either at

27

trial or at the pre-trial hearing, Detective Moore testified that the two victims did name David Arceneaux as the perpetrator very shortly after the incident occurred. Additionally, at the pre-trial hearing on the admissibility of the evidence, Detective Moore identified the defendant as the David Arceneaux named as the perpetrator by Mr. Alexander. Thus, contrary to the defendant's argument, there was an in-court identification of the defendant as the perpetrator of the prior incident. The defendant could have questioned Detective Moore regarding his in-court identification but chose not to do so. There is no question that in order to prove the defendant perpetrated the January 4, 2014 incident beyond a reasonable doubt, more evidence would have been needed to support the identification of the defendant as the same David Arceneaux named by Mr. Alexander and Mr. Delahoussaye. As stated by the supreme court, however, the evidence of the prior incident does not need to be sufficient to convict the defendant beyond a reasonable doubt:

> We caution, however, that this hearing is not intended to be a "mini trial" of the prior offenses. The state is simply required to make some showing of sufficient evidence to support a finding that defendant committed the other act. We cannot mandate or prohibit a specific form of evidence applicable to every case. Although testimony is not required, it may be necessary depending on the facts of a particular case. Other times the submission of documents, such as a police report or conviction, and a summation of the other crime, wrong, or act will suffice. Sufficiency of the state's evidence naturally must be determined on a case by case basis.

*Taylor*, 217 So.3d at 292 (citations omitted). Considering this standard of proof, and applying it to the facts before us, we find the state made a showing of sufficient evidence that supports a finding the defendant committed the prior act. The trial court did not abuse its discretion in finding the state's offering was sufficient.

28

## CONCLUSION

The defendant's convictions and sentences are affirmed. However, the trial court is instructed to correct the court minutes of sentencing to delete the denial of the benefit of parole for the defendant's conviction of distribution of marijuana.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules−Courts of Appeal, Rule 2−16.3.